IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 1, 2001 Session

## BARBARA JEAN McCALL v. KEVIN GREEN

**Appeal from the Juvenile Court for Washington County**
**No. 13751      Shirley B. Underwood, Judge**

**FILED APRIL 9, 2001**

**No. E1999-02827-COA-R3-CV**

This is an action where Kevin Green seeks to change custody of his son, Zachary Green, from Zachary's mother, Barbara Jean McCall. We find an order entered contended by Ms. McCall to be an agreed order was not in fact an agreed order, nor a valid one. We further find that the Trial Judge should have recused herself. We accordingly vacate the purported agreed order and direct that the Trial Judge recuse herself and another Judge be appointed by the Administrative Office of the Courts.

**Tenn.R.App.P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Edward L. Kershaw, Greeneville, Tennessee, for the Appellant, Kevin Green

H. Wayne Graves, Johnson City, Tennessee, for the Appellee, Barbara Jean McCall

**OPINION**

Kevin Green files a petition against Barbara Jean McCall seeking a change of custody of their child, Zachary Green, D.O.B. 8-9-94, who was born out of wedlock. The Trial Court dismissed his petition, resulting in this appeal where he raises four issues, two of which we believe are dispositive.

The first is whether the Trial Judge was correct in finding that an order contended to be an agreed order by Ms. McCall, was in fact an agreed order and precluded – under the doctrine of *res judicata* – consideration of any proof relative to custody occurring prior thereto, and second whether the Trial Judge should have recused herself.

The hearing encompassed two days of testimony, the first on October 16, 1998, and the second on May 4, 1999. Most of the testimony addressed the visitation rights that Mr. Green should have, as well as whether Ms. McCall improperly denied him visitation as provided by order of the Court.

With regard to the first dispositive issue, the proof shows that, although the order might have been agreed to at one point, counsel for Ms. McCall changed the order, which he contends was only in a minor way, resulting in Mr. Green disavowing it, and it may be inferred his then counsel also disavowed it by not signing the order.

Both this Court and the Supreme Court have addressed the specific question here presented. In <u>Sullivan County v. Lyon</u>, an unreported opinion authored by Judge Susano, filed in Knoxville on December 29, 1999, which relied upon the Supreme Court case of <u>Harbour v. Brown for Ulrich</u>, we said the following:

> We hold that the trial court's entry of the Original Agreed Order was improper. A court's power to render a judgment by consent is necessarily dependent upon the consent of the parties. <u>Harbour v. Brown for Ulrich</u>, 732 S.W.2d 598, 599 (Tenn.1987). This consent must "exist at the very moment the court undertakes to make the agreement the judgment of the court." *Id.* (quoting *Burnaman v. Heaton*, 240 S.W.2d 288, 291 (Tex.1951)).

Thus, it appears that the order of September 1998 was not a valid order and could not be the basis of a plea of *res judicata* as to matters occurring prior thereto.

As to the second issue, during the examination of Mr. Green, the following occurred:

THE COURT: Do you not have any relatives in Nashville, Davidson County, or that area?

A. No.

THE COURT: You have none whatsoever?

A. No.

THE COURT: What, if any, contact have you ever made in Nashville with some of the Greens?

A. I have no – I'm pretty confident that I have no relatives in Nashville.

THE COURT: Well, my question was have you at any time talked to anyone by the name of Green in Nashville?

A.   No, Your Honor.

THE COURT:   You've not talked with a juvenile court judge in Nashville...

A.   Oh, I'm sorry.  I apologize.  Adams – Judge Adams Green, yes, I'm sorry.

THE COURT:   For what reason did you call her?

A.   A friend of mine is a friend of hers, and I had a conversation with her.  And I've also seen her – I'm friends with some councilmen there, and we went to a juvenile court thing on another occasion, and the vice-mayor was there; another councilman at large there, and they were showing the juvenile courtroom, and I went with my friend, George Armistead.

THE COURT:   But why would you discuss anything with her, knowing that this was pending in this Court?

A.   Advice.

THE COURT:   Advice for Mr. Kershaw?

A.   Advice for me.

THE COURT:   Sir?

A.   Advice for myself – what to do in the situation.

THE COURT:   So about how many occasions have you had conversations with her?

A.   Two.  Once at juvenile court, and one the other time.

THE COURT:   Do you recall what you might have said to her, and what you asked her?

A.    I mean, I'm not sure I can recall specifically, other than the fact I'm in a situation, I'm not getting to see my son, and where do you go with this kind of situation.  And Bobbie is not paying attention to what all these court orders say.  I continue to come back into court.  I've been going to court for two years and we still don't get a final answer on it.  Those were the kind of questions I asked her.

THE COURT:   What replies did she give you?

A. Not much, not much.

THE COURT: How did you get in to see her – through whom did you see her?

A. George Armistead. He's a councilman at large.

THE COURT: Who is...

A. George Armistead. He's a councilman at large, and a good friend of mine.

THE COURT: From Marriott?

A. No. He owns his own business. He has a couple of businesses, but again he's a councilman. He knows a lot of people in Nashville.

THE COURT: Well, you understand my concern. Of course, she's been a long time friend of mine, and she did mention this to me, Mr. Kershaw, and I'm quite concerned that he would do something of that kind. This really is quite disturbing to me. As a mater of fact, I introduced Judge Adams, when she was – before she married Mr. Green – to the Supreme Court in Nashville, many years ago. And there is this camaraderie between judges, and this doesn't sit very well with any of us. It's quite disturbing, and I just felt like...

A. It was nothing more than advice, Your Honor.

THE COURT: Yes, but it was certainly out of place. It was not appropriate. Now, one last question I want to ask you, you have – back at the beginning we started – I'd say the same thing with her if she had done that, or attempted to raise a big issue about this order that I approved because you weren't here. And I guess I'm somewhat taking the issue personally. But I had to bring this up, because this is quite disturbing to me...

MR. KERSHAW: Your Honor, I mean absolutely no disrespect in saying this, but I feel like...

THE COURT: Did you have knowledge of it?

MR. KERSHAW: I don't know if I knew that he talked to this Judge or not. If I did, it didn't factor in with me, but if he had asked me if he could talk to the Judge I wouldn't have said, "No." I would have said, "Sure, you're welcome to ask for other advice" if for no other reason than to help me, because I don't know everything. So if a judge told him, "Hey, tell your lawyer to do this," I would do it.

THE COURT: Would you go to Judge Wexler, or send him to Judge Wexler if this was his court?

MR. KERSHAW: No, but I have gone to Judge Wexler many times if I had something in front of Chancellor Frierson and said, "Judge, what do you think the best way for me to handle this is? You've been on the bench now for 60 years, or you've been practicing law for 60 years, you've been on the bench for 24 years, maybe." And on many occasions – Judge Wexler and I have a close relationship anyway. But on many occasions, he has given me advice on what he would do.

THE COURT: But you would go for a personal case of your own, Mr. Kershaw.

MR. KERSHAW: Yes. Now, having said that, let me say this, and again I mean no disrespect, but if it bothers you, I think you've got a duty to recuse yourself, if it disturbs you. I don't think it's inappropriate for him to talk to another judge, and again, I would never say anything disrespectful to you, Your Honor.

THE COURT: I will not recuse myself, if you want to use that for other purposes, but I will say this, that it does affect me greatly from a professional leave, and it also, I think, goes to the credibility of the witness, whether they're active in a particular matter or not.

Thereafter, at the close of the hearing on May 4, the Trial Court stated the following:

THE COURT: I'm strongly considering and probably will talk to the District Attorney General Crumley as to whether or not to go through the process to issue – to have Mr. Green arrested for obstruction of justice by his conduct, in going to a Judge in Nashville, Tennessee to register his complaints. I'll discuss it with him maybe tonight or certainly tomorrow – as soon as I can contact him. I think – I hope we're on tape. I hope his conduct will never again occur under any circumstance. Number one, I think more people in life need to realize that you don't tamper with justice under any circumstances, and certainly it does greatly upset me that he would do what he did do. And with that I say to you, Mr. Green, that I think the Attorney General will definitely rely on any testimony I give him, or statements I give him about your conduct. We do have it on tape, and with that, I'll let you go.

The only proof relative to Mr. Green's contact with Juvenile Judge Adams-Green in Nashville, is that he was concerned that his petition for change of custody was being unduly delayed. Apparently, the Trial Judge felt that Mr. Green was contacting Judge Adams-Green for the purpose of having her bring influence to bear upon Judge Underwood, but there is absolutely no proof in the record that this was the case.

What is in the record is that the Trial Judge was upset with Mr. Green to the degree that she was threatening to have criminal charges preferred against him, and her knowledge of his actions which prompted this was obtained prior to the hearing on May 4 and prior to her decision.

We conclude that the Trial Judge's own statements, specifically to have Mr. Green arrested, discloses a bias against him which made it unacceptable for her to proceed to dispose of his petition.

We accordingly find the Trial Court should have recused herself, as requested by counsel for Mr. Green, and that the judgment entered by her should be vacated and the cause remanded for trial before another Judge designated by the Administrative Office of the Courts.

For the foregoing reasons the judgment of the Trial Court is vacated and the cause is remanded. Costs of appeal are adjudged against Ms. McCall.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE